**BONOLLO RUBBISH REMOVAL, INC., Plaintiff,**

v.

**TOWN OF FRANKLIN, et al., Defendants.**

No. 94 Civ. 10808 (MEL).

United States District Court, D. Massachusetts.

May 26, 1995.

Edward J. McCormick, III, McCormick & Maitland, Norfolk, MA, for Bonollo Rubbish Removal, Inc.

Mark J. Lanza, Canton, MA, for Mario DeBaggis, Bruce J. Hunchard.

Steven J. Comen, James J. Dillon, J. Anthony Downs, Goodwin, Proctor & Hoar, Boston, MA, for WMX Technologies, Inc.

Steven J. Comen, Ann L. Carpenter, James J. Dillon, J. Anthony Downs, Goodwin, Proctor & Hoar, Boston, MA, for Waste Management, Inc., Wheelabrator Millbury, Inc.

LASKER, District Judge.

In *C & A Carbone, Inc. v. Town of Clarkstown, New York,* —— U.S. ——, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994), the Supreme Court declared that a municipal ordinance which required trash haulers to deliver solid waste to a specified transfer station, thereby forbidding them from depositing the waste out of state, violated the Commerce Clause of the United States Constitution. In December 1987, the town of Franklin, Massachusetts, through its Board of Health, enacted a by-law which fit the *Carbone* pattern. Bonollo Rubbish, Inc., the plaintiff in this case, was a trash hauler in and from Franklin.

In this action, Bonollo sues Franklin, officials of the Franklin Board of Health (collectively with the town itself, the "Town Defendants"), WMX Technologies, Inc., Waste Management, Inc. and Wheelabrator Millbury, Inc. (the last three, collectively, the "Corporate Defendants"), alleging violations of the Commerce Clause of the U.S. Constitution, the antitrust laws and the civil rights laws. Several motions are pending. Bonollo moves for summary judgment against the Town Defendants to declare the Franklin by-law invalid and to enjoin its enforcement. The Town Defendants cross-move to dismiss or, in the alternative, for summary judgment on Bonollo's Commerce Clause claims and its claims that the Town Defendants are liable for damages under 42 U.S.C. § 1983. The Corporate Defendants move to dismiss the complaint as to them.

Bonollo's motion to declare the by-law invalid is granted, but the request for injunctive relief against the town of Franklin is denied as moot. However, because the by-law did violate Bonollo's rights before it was amended in February 1995, the Town Defendants' motion is denied as to Bonollo's claim for damages under 42 U.S.C. § 1983 (that is, as to Count 6 of the complaint). The individual Town Defendants' cross-motion is granted as to all claims against them on the grounds of qualified immunity.

The Corporate Defendants' motion for summary judgment dismissing the complaint as to them is granted and Bonollo's motion to amend its complaint a second time to incorporate additional antitrust allegations against the Corporate Defendants is denied.

I.

This case stems from Franklin's efforts to dispose of its solid waste in an environmentally sound but cost-effective manner. As

the Supreme Court observed in *Carbone*, "[a]s solid waste output continues apace and landfill capacity becomes more costly and scarce, state and local governments are expending significant resources to develop trash control systems that are efficient, lawful, and protective of the environment." —— U.S. at ——, 114 S.Ct. at 1680. Franklin is no exception.

Since 1987, the cornerstone of the town's trash control system has been a contract between it and Wheelabrator Millbury, by which the town has agreed to ship its solid waste to Wheelabrator Millbury's waste to energy facility in Millbury, Massachusetts. The contract provides for a set "tipping fee" per ton of solid waste delivered to the facility and requires Franklin to deliver a minimum number of tons of solid waste per year. Waste Management—a commercial hauler of solid waste—is a sister corporation of Wheelabrator Millbury. WMX Technologies, Inc. is the parent of both companies.

To coordinate the collection and removal of solid waste effectively and comply with the minimum tonnage requirement contained in the Wheelabrator Millbury contract, Franklin—through its Board of Health—enacted a series of by-laws outlining the requirements which haulers are obligated to meet to be eligible to haul trash in Franklin.[1] The regulatory scheme devised by the Franklin Board of Health divides haulers of residential solid waste into two categories based on the number of dwelling units contained in the residential buildings served by the hauler. Solid waste generated by residential buildings containing less than three dwelling units can be removed and transported only by a hauler who is under contract with the town of Franklin. Solid waste generated by residential buildings with three or more dwelling units is generally also removed and transported by haulers who are under contract with the town. However, persons not under contract (so-called "alternate haulers") are allowed to transport solid waste from buildings with three or more units if they acquire a permit from the town. As enacted in De-cember 1987 and amended in July 1990, § 151.2 of Franklin's local code, the by-law at issue in the case at hand, provided:

§ 151.2 Permit issuance restrictions

A. No permit for the removal of solid waste from residential buildings (a residential trash collection permit) shall be issued by the Board of Health of the Town of Franklin pursuant to M.G.L. c. 111, § 31A, unless the following conditions are attached to said permit:

(1) All residential trash collected in the Town of Franklin shall be caused to be delivered to the Wheelabrator Millbury Incinerator in Millbury, Massachusetts, or to such other disposal facility as may be designated, in writing by the Town Administrator, in the name of and to the tonnage account of the Town of Franklin.

(2) If the permit holder receives direct payment from a customer for the collection of residential trash, the permit holder shall reimburse the Town in full, on a weekly basis and at the Town's contracted rate schedule, for tonnage caused to be delivered to the Town's designated disposal facility in the name of and to the tonnage account of the Town of Franklin. The permit holder shall submit a copy of weight scale receipts to the Town on a weekly basis. . . .

Thus, to acquire a permit, would-be alternate haulers were required to agree, among other conditions, to use the Millbury facility exclusively for the disposal of trash collected in Franklin and to pay the tipping fees specified in the contract between Franklin and Wheelabrator Millbury. The by-law also provided that permit holders must submit a performance bond to secure Franklin's obligation to pay tipping fees and barred permit holders from delivering trash collected from other towns to the Wheelabrator facility. The latter requirement was intended to prevent non-Franklin trash from being counted toward Franklin's minimum tonnage requirement.

---

1. All parties agree that under Massachusetts law the town had the authority to enact the by-law. *See* M.G.L. c. 111, §§ 31A and 31B (granting cities and towns in the Commonwealth wide authority to regulate the removal and transportation of solid waste that originates in their jurisdiction). Franklin's right to enact by-laws in this area generally is therefore not at issue.

On or about November 28, 1990, Bonollo Rubbish applied for and received an alternate hauler permit to transport and remove residential solid waste from buildings with three or more dwelling units, subject to the by-law and the conditions outlined above. On April 27, 1994, the Franklin Board of Health revoked Bonollo's permit, effective June 30, 1994. The Board's stated reason for taking this action was Bonollo's failure to meet several conditions listed in the by-law, including the requirement that Bonollo deliver all waste collected in Franklin to the Wheelabrator Millbury facility. Bonollo does not contest the fact that it had been delivering waste collected in Franklin to other sites, including a facility located in Johnston, Rhode Island which charged a tipping fee of $42.00 per ton, as compared to the $59.76 per ton charged by Wheelabrator Millbury.

Upon the Board's decision to revoke its permit, Bonollo filed this suit, alleging that Franklin's actions violated rights guaranteed it by the Commerce Clause and seeking damages under 42 U.S.C. § 1983. Bonollo moved simultaneously for a preliminary injunction against the Town Defendants enjoining them from taking any action to rescind or revoke its residential trash permit.

It seems likely that the *Carbone* decision effectively dictated the parties' actions after May 14, 1994. On June 1, Judge Stearns issued an order stipulated to by the parties granting a preliminary injunction. On June 15, 1994, the Franklin Board of Health voted to reverse its April 27 decision and struck from Bonollo's permit the requirement that Bonollo deliver waste to the Wheelabrator Millbury facility. On February 15, 1995, the Franklin Town Council amended the by-law to provide that the requirement to deliver trash collected in Franklin to the Wheelabrator facility applies only to haulers operating under a contract with the town of Franklin (i.e., *non*-alternate haulers). Thus, the by-law no longer applies to Bonollo and Bonollo's alternate hauler permit was never actually revoked.

The original complaint named the Town Defendants only. On June 24, 1994, Bonollo filed an amended complaint restating its claims against the Town Defendants and alleging for the first time that the Corporate Defendants' actions had violated federal antitrust laws, specifically 15 U.S.C. §§ 1, 2 and 14, as well as the civil rights statute, 42 U.S.C. § 1983.

## II.

Both the Town and Corporate Defendants move to dismiss the complaint as time-barred. The parties agree that the appropriate limitations periods are three years under M.G.L. c. 260, § 2A for claims grounded in alleged violations of the Commerce Clause and 42 U.S.C. § 1983, and four years under 15 U.S.C. § 15b for the antitrust claims. The defendants contend that the limitations period began running when the injuries Bonollo complains of originated—that is, when the by-law was enacted in its final form in 1990, in the case of the Town Defendants, and when the waste supply agreement between Wheelabrator Millbury and the town was consummated in 1987, in the case of the Corporate Defendants. Bonollo takes the position that the clock did not start running until May 2, 1994, the day the Franklin Board of Health informed it that its permit was being revoked effective June 30, 1994.

■ As the Town Defendants correctly point out, statutes of limitation generally begin to run when a plaintiff discovers, or through reasonable diligence should have discovered, the facts giving rise to its cause of action. *Holmberg v. Armbrecht,* 327 U.S. 392, 396–97, 66 S.Ct. 582, 584–85, 90 L.Ed. 743 (1946). However, the usual rule is preempted when the conduct complained of constitutes a continuing violation of the plaintiff's rights, including systemic violations stemming from a "policy or practice [violative of plaintiff's rights that] continues into the limitations period." *Jensen v. Frank,* 912 F.2d 517, 523 (1st Cir.1990). The hallmark of a systemic violation is the presence of actual continued injury to the plaintiff. Thus, "if both [the offending policy or practice] and injury are ongoing, the limitations clock does not begin to tick until the invidious conduct ends." *Mack v. Great Atlantic and Pacific Tea Co., Inc.,* 871 F.2d 179, 183 (1st Cir.1989).

■ This case charges systemic violations of the Constitution and the antitrust laws. Bonollo maintains that it sustained damages by being legally compelled to deliver solid waste to the Wheelabrator facility, and therefore pay that facility's higher tipping fee. While Bonollo did now and then haul trash to its preferred site in Rhode Island in violation of the by-law, at other times it did comply by delivering solid waste to Wheelabrator Millbury. To the extent Bonollo can prove that it paid higher tipping fees as a result of the enactment of the by-law, those fees represent systemic violations of Bonollo's rights under the Constitution and the antitrust laws in light of the conclusions reached below because, unlike in *Jensen* or *Mack,* the plaintiff's injury here (the higher fees) continued for as long as the practice or policy complained of (the by-law) was in existence. Therefore, if Bonollo can show that it patronized Wheelabrator Millbury within the last three years, its claims would be timely.

### III.

With regard to the Town Defendants, Bonollo contends that the by-law violated rights guaranteed it under the Commerce Clause, that the by-law should therefore be declared void and the Town Defendants held liable under 42 U.S.C. § 1983. Bonollo has moved for summary judgment on its direct Commerce Clause claims but has not moved on its claims under § 1983.

### A.

The Town Defendants do not dispute that, under *Carbone,* the by-law violated the Commerce Clause and there is no question that it did. Franklin appears to have realized the decision's impact immediately and acted accordingly: the by-law was never actually applied to Bonollo, Bonollo's permit was amended in June 1994 to release it from the obligation to ship solid waste to Wheelabrator Millbury and, in February 1995, the by-law was amended so as to render inoperative the provisions Bonollo complains of. While the *coup de grace* has already been delivered, however, the allegation that the by-law violated the Commerce Clause is a necessary element of Bonollo's claim for damages incurred prior to the by-law's repeal.

### B.

The Town Defendants contend that Bonollo's causes of action under both the Commerce Clause and § 1983 are moot because the by-law has been repealed. They are correct to the extent that Bonollo seeks injunctive relief: there is no longer a by-law to enjoin, so the claim for an injunction is moot by definition and is accordingly dismissed.

■ It does not, follow, however, that Bonollo's claim against the town for damages is moot. Bonollo claims that it was forced under the by-law to pay higher tipping fees than it otherwise would have paid in Rhode Island. If this is true, then Bonollo's claim for damages under § 1983 grounded in that violation is not mooted by the fact that the by-law was repealed after the injury occurred. Bonollo has not moved for summary judgment on its § 1983 claims, so whether it is entitled to damages cannot be established at this time. The Town Defendants' motion to dismiss the damage claims under § 1983, however, is denied.

### C.

■ The Town Defendants next move to dismiss all of the claims against DeBaggis, Hunchard and Edge, who collectively comprise the Franklin Board of Health, and Slein, an agent of the Board, because no allegation is made against any of them in their individual capacities and each is entitled to qualified immunity.

Although qualified immunity is an affirmative defense, a government official is presumed to be immune from suit provided that the court does not find that the "official *'knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], *or* ... he took the action with the *malicious intention* to cause a deprivation of constitutional rights or other injury....'" *Harlow v. Fitzgerald,* 457 U.S. 800, 815, 102 S.Ct. 2727, 2737, 73 L.Ed.2d 396 (1982) (quoting *Wood v. Strickland,* 420 U.S.

308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975)) (emphasis in original).

Here, the only concrete injury that Bonollo alleges—the higher tipping fees—was caused by the enactment of the by-law in its final form in 1990. Bonollo does allege as well that the Board of Health's decision to revoke its permit caused it additional injury, but has offered no evidence whatsoever or proffered any theory as to how that decision could have damaged it, given that the Board's decision to revoke Bonollo's permit was reversed before the revocation took effect. Moreover, Bonollo does not allege that the Board members adopted the by-law or voted to revoke the permit maliciously.

Since the alleged offending event occurred at the latest in 1990, the individual Town Defendants cannot be charged with the responsibility of knowing that the by-law violated the Commerce Clause, because the earliest they could reasonably have done so was 1991, when the Court of Appeals of this Circuit summarily affirmed Judge Torres' decision in *Stephen D. DeVito, Jr. Trucking v. Rhode Island Solid Waste Management Corporation*, 770 F.Supp. 775 (D.R.I.1991), *aff'd* 947 F.2d 1004 (1st Cir.1991). In *DeVito*, Judge Torres granted a preliminary injunction suspending the enforcement of a resolution adopted by RISWMC, a quasi-public agency having broad authority to regulate the collection and transportation of solid waste in Rhode Island. As in the case at hand, the resolution required haulers collecting solid waste in the state to deliver it to a particular disposal site, thereby having the effect of preventing solid waste collected in Rhode Island from being transported to disposal sites in other states. *Id.* at 777–78. Relying primarily on *City of Philadelphia v. New Jersey*, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978), Judge Torres found that the RISWMC resolution had the purpose and effect of "directly and completely eliminat[ing]" interstate commerce in order to confer an economic benefit on Rhode Island interests. *DeVito*, 770 F.Supp. at 783, and that each of the local purposes put forth by RISMWC to justify the resolution[2] was either illegitimate or could have been served by less discriminatory means. *Id.* at 783–85.

*DeVito* was not decided until 1991 and Bonollo's contention that the result in *Carbone* was a logical extension of earlier decisions—most notably *Philadelphia v. New Jersey*—is undermined by the argument of the three dissenters in *Carbone* that *Carbone* in fact represented a significant departure from previous decisions. Justice Souter wrote:

"The ordinance [struck down in *Carbone*] falls outside that class of tariff or protectionist measures that the Commerce Clause has traditionally been thought to bar States from enacting against each other, and when the majority subsumes the ordinance within the class of laws this Court has struck down as facially discriminatory (and so avails itself of our 'virtually *per se* rule' against such statutes ...), the majority is in fact greatly extending the Clause's dormant reach."

—— U.S. at ——, 114 S.Ct. at 1692 (Souter, J., dissenting) (citations omitted). In sum, the state of the law in 1990 was not such as to put a reasonable Board of Health member on notice that the Franklin by-law constituted a violation of the Commerce Clause of the U.S. Constitution—assuming that the Board member had ever heard of that Clause. The individual Town Defendants therefore enjoy qualified immunity and the complaint is dismissed as to them.

### D.

■ Finally, the Town Defendants contend that Bonollo waived its right to chal-

---

**2.** Those local purposes were:
1. maximization of the rate of recycling and recovery;
2. protection and conservation of public resources and the public health;
3. prevention of the illegal disposal of solid waste;
4. elimination of the possibility of state agency or municipal liability for the illegal disposal of hazardous waste in the event that such waste was accidently commingled with solid waste shipped to out of state facilities;
5. facilitation of planning for solid waste transportation; and
6. facilitation of overall long term planning.

*Id.* at 783–85. The Town Defendants have not argued that these—or any—local purposes motivated its decision to enact the by-law, and have not pointed to any specific state policy served thereby.

lenge the constitutionality of the by-law by agreeing to the conditions contained in the security agreement it executed pursuant to its application for a permit to haul solid waste in Franklin.

■ While it is true that constitutional rights may be waived, such a waiver must be made knowingly. The security agreement signed by Bonollo does specify that Bonollo agreed to comply with the requirement contained in the by-law that solid waste collected in Franklin be delivered to Wheelabrator Millbury. However, the agreement made no mention of the possibility, or even hinted, that by signing it the permittee would waive its constitutional rights. The language therefore cannot form the basis of a waiver of Bonollo's claims.

### IV.

Bonollo also sues the affiliated group of corporations [3] which contracted to operate the waste to energy facility which the Franklin By-law required alternate haulers in Franklin to utilize, alleging that the Corporate Defendants are liable for creating a monopoly in violation of 15 U.S.C. § 2, tying in violation of 15 U.S.C. § 14 and price fixing in violation of 15 U.S.C. § 1. Bonollo also claims that the Corporate Defendants are liable under 42 U.S.C. § 1983.

Aside from claiming that Bonollo's causes of action are not timely (an issue addressed above), the Corporate Defendants assert that Bonollo has not—and cannot—plead the requisite elements of the three antitrust claims, that they are protected from suit under the antitrust laws by the state action and *Noerr–Pennington* doctrines and that violations of the antitrust laws cannot, as a matter of law, be repleaded under the rubric of § 1983.

### A.

■ Bonollo's antitrust claims are so cursory as to court dismissal for failure to state a claim. However, Bonollo's antitrust claims founder on principles which would trump those claims even if Bonollo was able to establish prima facie cases of monopolization, tying and price fixing.

In *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), the Supreme Court held that there is "nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature," even if those activities "would violate the Sherman Act if [they] were organized and made effective solely by virtue of a contract, combination or conspiracy of private persons, individual or corporate." *Id.* at 350–51, 63 S.Ct. at 313.

Following the rationale of *Parker,* the Court ruled in *Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985), that a municipality is immune from suit under federal antitrust statutes if the state legislature delegated to the municipality the "authority to take action that foreseeably will result in anticompetitive effect." *Hallie,* 471 U.S. at 43, 105 S.Ct. at 1718. The *Hallie* Court added that for a municipality to enjoy such immunity, the state legislature need not enact a "specific, detailed legislative authorization" of anticompetitive action, *Id.* at 39, 41–42, 105 S.Ct. at 1716, 1717–18. Rather, the municipality "must demonstrate that it is engaging in the challenged activity pursuant to a clearly expressed state policy." *Id.* at 40, 105 S.Ct. at 1717.

In *California Retail Liquor Dealers Assn. v. Midcal Aluminum, Inc.,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980), the Court held that a private party engaged in a challenged activity pursuant to a contract with, or authorization from, a state or local government is entitled to state action immunity if it can show that it is subject to active state supervision. *Id.* at 105–06, 100 S.Ct. at 943.

In *Columbia v. Omni Outdoor Advertising, Inc.,* 499 U.S. 365, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991), the Court, extended antitrust immunity to municipalities which contract with a private party to the exclusion of the private party's competitors, even when

---

**3.** Bonollo has sued Wheelabrator Millbury, its parent, WMX Technologies, Inc. and its sister corporation, Waste Management, Inc. However,

only Wheelabrator Millbury is explicitly alleged to have done anything injurious to Bonollo's interests.

there might have been conspiratorial activity between the municipality and the private party with which it has contracted. *Id.* at 379, 111 S.Ct. at 1353. The *Omni Outdoor Advertising* Court held further that, under the *Noerr–Pennington* doctrine formulated in *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) and *Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), "[t]he federal antitrust laws ... do not regulate the conduct of private individuals in seeking anticompetitive action from the government." *Omni Outdoor Advertising*, 499 U.S. at 379–80, 111 S.Ct. at 1353–54.

In *Tri–State Rubbish v. Waste Management, Inc.*, 998 F.2d 1073 (1st Cir.1993), a case which, like the one at hand, involved a contract for the receipt and disposal of solid waste, the Court of Appeals of this Circuit affirmed the dismissal under the state action doctrine of antitrust claims against a Maine municipality and Waste Management of Maine, the plaintiff's private competitor. The defendant city and several other Maine municipalities had formed the Mid–Maine Waste Action Corporation ("MMWAC") for the purpose of constructing a waste to energy plant, as the municipalities were explicitly authorized to do under Maine law. *Id.* at 1075. In much the same way as Franklin, each municipality passed a local ordinance requiring waste haulers to deliver solid waste, collected within its jurisdiction, to the plant and to pay a set tipping fee per ton delivered. *Id.* at 1075. These ordinances were authorized by a Maine statute, which provided that a municipality could "require that 'solid waste' generated within its boundaries be delivered to a 'designated disposal or reclamation facility.'" *Id.*

A contract between MMWAC and Waste Management of Maine provided that Waste Management would operate a temporary processing facility for the MMWAC member municipalities' waste. As compensation, Waste Management received from MMWAC a fee per ton of solid waste which was slightly less than the tipping fee that MMWAC charged customers hauling waste from its member towns. Tri–State Rubbish sued Waste Management, MMWAC and the Maine municipality from which Tri–State was prevented from hauling trash by the MMWAC–Waste Management agreement, claiming, among other things, that the city's ordinance requiring haulers to deliver trash to the MMWAC site and MMWAC's contract with Waste Management combined to constitute a monopolization of trash disposal services in the region, an illegal restraint of trade and predatory pricing. *Id.* at 1076.

Citing *Hallie* and *Omni Outdoor Advertising*, the Court of Appeals held that MMWAC's status was that of a municipality and that, accordingly, MMWAC was immune from antitrust liability in light of Maine's clear authorization of both the municipal ordinances mandating the use of the temporary facility and the defendant city's contract with the private defendant. *Id.* at 1077–78, 1078 n. 3. As to the plaintiff's antitrust claims against the private defendant, the court agreed with the district court that the provision in MMWAC's agreement with the city requiring compliance by the private defendant with all pertinent laws constituted adequate state supervision; that is, that adequate municipal supervision, embodied by the contractual provision, was legally equivalent to adequate state supervision, and that, accordingly, under the state action doctrine, the private defendant was immune from suit. *Id.* at 1078–79. The court therefore affirmed the dismissal of the antitrust claims against the private defendant, the city and MMWAC. *Id.* at 1079–81.

Although these decisions would appear to dispose of Bonollo's antitrust claims, Bonollo attempts to distinguish the case at hand. First, Bonollo contends that the Corporate Defendants have not established that Massachusetts has enacted a policy of replacing competition with regulation in the solid waste disposal field, a requirement set forth in *Hallie*, 471 U.S. at 40, 105 S.Ct. at 1717. However, in *Omni Outdoor Advertising*, the Court explicitly rejected "the contention that this requirement can be met only if the delegating statute explicitly permits the displacement of competition." 499 U.S. at 372, 111 S.Ct. at 1350. Rather, "[i]t is enough ... if suppression of competition is the 'foreseeable

result' of what the statute authorizes." *Id.* at 373, 111 S.Ct. at 1350 (citation omitted).

M.G.L. c. 111, §§ 31A and 31B [4] grant cities and towns in Massachusetts broad authority to enact ordinances and grant permits with respect to the collection and disposal of solid waste. *See Tri–State Rubbish,* 998 F.2d at 1077–78 ("waste disposal ... is a traditional local-government function"). In addition, M.G.L. c. 44, § 28C(g) [5] explicitly authorizes contracts of the type between Franklin and Wheelabrator Millbury.

Franklin's enactment of the by-law was clearly a foreseeable result of this statutory scheme. The legislature has granted cities and towns in the Commonwealth the unequivocal right to determine who may haul solid waste from their jurisdictions and under what rules and conditions they may do so. Massachusetts cities and towns are also authorized to contract for the disposal of solid waste at facilities of their choosing, such contract specifying the rate to be charged by the disposal facility, subject only to a fairness requirement which Bonollo has not alleged was violated. Implicit in—indeed, necessary to—this scheme is a local government's right to require entities which haul trash from the town to use the facility with which the town has contracted. A municipality would be hard pressed to find a waste to energy facility willing to agree to accept its trash (and set a rate for doing so) purely on the chance that the arrangement might be profitable. The by-law is consistent with the legislature's apparent judgment—embodied in M.G.L. c. 111, §§ 31A and 31B and M.G.L. c. 44, § 28C(g)—that local governments in the Commonwealth should have discretion to arrange for the disposal of solid waste in their towns in any manner they deem to be cost effective and in furtherance of the public health. It is entirely foreseeable that the exercise of such discretion could entail a displacement of competition in the market for trash disposal services.

Bonollo contends further that the Corporate Defendants have failed to show that they are subject to active state supervision, as they must if, as private actors, they are to be eligible for state action immunity. *See Midcal,* 445 U.S. at 105–06, 100 S.Ct. at 943 (articulating the active state supervision requirement for private entities). *Tri–State Rubbish* clearly disposes of this contention. Assuming Wheelabrator Millbury must prove adequate state supervision, that requirement is met by virtue of § 17(2) of the Waste Supply Agreement dated August 10, 1987 between Franklin and Wheelabrator Millbury, in which Wheelabrator Millbury agreed to "comply with all federal, state and local laws, rules, ordinances, regulations and all administrative and judicial positions known to it." This is a mirror image of the provi-

---

4. These provisions read in pertinent part:

§ 31A · Permit for removal or transportation of garbage....

No person shall remove or transport garbage, offal or other offensive substances through the streets of any city or town without first obtaining a permit from the board of health for such city or town.... An application for such permit shall be in such form and contain such information, on oath, as such board shall require.

§ 31B Rules and regulations for removal of garbage....

Boards of health shall, from time to time, make rules and regulations for the control of the removal, transportation or disposal of garbage, offal or other offensive substances.

5. M.G.L. c. 44, § 28C(g) reads in pertinent part:

In addition to any other power conferred by law, a city or town may from time to time contract for the operation by others of any solid waste facility or facilities financed or to be financed by such city or town in whole or in part ... and may contract with any such operator for

the disposal or refuse, garbage or waste.... *All other cities, towns and other public agencies and private parties are also authorized from time to time to contract with such city or town or with any such operator for the disposal of refuse, garbage, and waste.... Such contracts may be for such periods as agreed upon by the parties and, without limiting the generality of the foregoing, may include provisions for the delivery of minimum amounts of refuse, garage and waste and payments for the use of the facilities to be based thereon....*

Any contract with a city or town for the operation by others of any solid waste facility or facilities under this section ... shall contain such provisions as may be deemed necessary to protect the public interest, including but not limited to provisions as to the rates to be charged.... In entering into contracts for the operation of the facility or facilities, the city or town is directed, insofar as practicable, to provide for just and equitable rates and a fair but not excessive return to the operator....

(emphasis added).

sion between MMWAC and its member municipalities which the *Tri–State Rubbish* court held conferred immunity on the private defendant before it. *See* 998 F.2d at 1079. Indeed, the case is even stronger for the Corporate Defendants here because they have directly obligated themselves to abide by applicable laws and regulations, whereas in *Tri–State Rubbish* the private defendant's obligation was indirect only.

Moreover, the *Tri–State Rubbish* court held that the private defendants before it need not be subject to state supervision because "the choice to make such payments [i.e., tipping fees] was that of MMWAC and its actions are protected as state action." *Id.* The court wrote further: "[t]o treat the mere receipt of such authorized payments as wrongful would undermine the *Parker* protection afforded [state and local governments] and misstate the purpose of the supervision requirement, which is to prevent the unregulated licensing of *private* anticompetitive conduct." *Id.* (emphasis in original). This rationale applies with equal force to the case at hand.

Third, Bonollo asserts that the *Noerr–Pennington* doctrine is inapplicable because the doctrine only immunizes efforts to influence government action, not actual anticompetitive behavior which results from the exercise of that influence. The argument is meritless. A *Noerr–Pennington* doctrine which shielded a private party in its attempt to secure a benefit from the government but left the party open to suit if the benefit was actually received would not serve the interests of free speech and open access to government that the *Noerr* and *Pennington* Courts intended to protect.

Finally, Bonollo argues that a defense grounded in the state action doctrine is unavailable to the Corporate Defendants because the state action in question—the by-law—was itself unconstitutional. Put another way, Bonollo contends that when state action immunity "conflicts" with the Commerce Clause, the immunity must yield. .

The weakness of this argument is that the state action doctrine and the Commerce Clause are not mutually exclusive. One of the activities complained of in *Omni Outdoor*

*Advertising* was passage of a municipal ordinance affecting the plaintiff's billboard business which a state court later found to violate the U.S. Constitution. 499 U.S. at 368, 111 S.Ct. at 1347. The Court concluded that both the municipality which enacted the ordinance and the private party who allegedly conspired with public officials to ensure its enactment were entitled to state action immunity, which was held to be appropriate even if the ordinance at issue is "substantively or even procedurally defective," *Id,* at 370–73, 111 S.Ct. at 1348–50; *see also Preferred Communications, Inc. v. Los Angeles,* 754 F.2d 1396, 1415 (9th Cir.1985), *aff'd,* 476 U.S. 488, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986) (unconstitutionality of city ordinance does not affect state action doctrine defense to antitrust claims); *Lease Lights, Inc. v. Public Service Company of Oklahoma,* 849 F.2d 1330, 1334 (10th Cir.1988), *cert. denied,* 488 U.S. 1019, 109 S.Ct. 817, 102 L.Ed.2d 807 (1989).

Moreover, even if the determination that the by-law was unconstitutional negated the Corporate Defendant's state action defense, the Corporate Defendants would still be shielded by the *Noerr–Pennington* doctrine. *See Omni Outdoor Advertising,* 499 U.S. at 379–80, 383–84, 111 S.Ct. at 1353–54, 1355–56 (*Noerr–Pennington* doctrine applied despite a state court's holding that the municipal ordinance which formed the basis of the challenged contract between the private defendant and the city violated plaintiff's First Amendment rights).

### B.

Bonollo asserts claims against the Corporate Defendants under 42 U.S.C. § 1983, although, as an initial matter, there is confusion as to which of Bonollo's rights the Corporate Defendant's are accused of violating. Count 26 of the complaint, which is against Wheelabrator Millbury but is representative of the § 1983 claims against the other two Corporate Defendants, alleges in part that Wheelabrator Millbury "conspired ... to decrease competition, restrain trade, put competition out of business and ... create a monopoly." This sounds for all the world like an antitrust suit brought as a claim

under § 1983. In *Middlesex County Sewerage Authority v. National Sea Clammers Association,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), the Supreme Court held that where, as here, a party is "alleged to have violated a federal statute which provides its own comprehensive enforcement scheme, the requirements of that enforcement procedure may not be bypassed by bringing suit directly under § 1983". *Id.* at 20, 101 S.Ct. at 2626 (internal quotations and citations omitted). Bonollo claims, however, that its § 1983 claims are actually predicated on the Corporate Defendants' alleged violation of its Commerce Clause rights, although the words "Commerce Clause" appear nowhere in the relevant portions of the complaint.

■ Even taking Bonollo at its word, however, the claim still fails. As the Court of Appeals of this Circuit stated in *Culebras Enterprises Corp. v. Rivera Rios,* 813 F.2d 506 (1st Cir.1987), "[r]esponsibility for ascertaining the constitutionality of enacted legislation will ordinarily rest with the legislating body. Absent factors such as bribe-taking or other criminal misconduct, considerations of free speech normally militate against finding the basis for § 1983 damages in the advocacy of programs and legislation, even if the programs or statutes are themselves unconstitutional." *Id.* at 519. This rule stems from the same First Amendment considerations that gave rise to the *Noerr–Pennington* doctrine—considerations that have as much force in the context of an action under § 1983 as they do in the context of an antitrust suit. Again, this result is in no way in "conflict" with the Commerce Clause, which would have been given full effect in invalidating the by-law had the by-law not been repealed.

## V.

■ Bonollo has moved to amend the complaint to include further factual allegations in connection with its existing claims and to add predatory pricing claims under 15 U.S.C. § 13A and claims for "unfair and deceptive methods of competition, actions and practices" in violation of M.G.L. c. 93A. The Corporate defendants oppose this motion on numerous grounds. The motion is denied.

## A.

. To the extent the proposed amendments are intended to buttress Bonollo's existing antitrust claims against the Corporate Defendants, they would not alter the result reached above. Even if the additional allegations made the claims more legally tenable in and of themselves (and they don't much), the state action and *Noerr–Pennington* doctrines are still dispositive.

As for the counts which Bonollo proposes to add, to sustain a claim of predatory pricing under 15 U.S.C. § 13A, a plaintiff must (1) "prove that the prices complained of are below an appropriate measure of [the defendant] rival's costs," *Brooke Group, Ltd. v. Brown & Williamson Tobacco,* — U.S. ——, ——, 113 S.Ct. 2578, 2587, 125 L.Ed.2d 168 (1993) (citations omitted) and (2) demonstrate that its rival "had a reasonable prospect ... of recouping its investment in below-cost prices," *Id.* at ——, 113 S.Ct. at 2588 (citations omitted)—that is, that competition would be injured as a result of the defendant's scheme. *Id.* at ——, 113 S.Ct. at 2588–89.

The proposed amendments do not make the necessary allegations as to the Corporate Defendants' costs, prices in the contracts entered into with other towns or even whether those contracts ever actually came into being. Moreover, the new claims are severely implausible. As the Corporate Defendants note, it is difficult to imagine how they could ever recoup their investment in predatory prices when tipping fees are fixed in the contract. *See Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (plaintiff alleging an economically implausible predatory pricing scheme faces a heightened burden).

Finally, it is doubtful whether Bonollo's claims meet the criteria of *Tri–State Rubbish* for pleading a predatory pricing cause of action. There, a predatory pricing claim analogous to those at issue here was held sufficient because the plaintiff's pleadings contained reasonably specific allegations, both as to prices and contracts that were

actually shown to exist. 998 F.2d at 1080–81. The proposed amendments here contain neither. In addition, the *Tri–State Rubbish* court was reluctant to apply the state action doctrine when it had no evidence that MMWAC exercised any control over the prices charged by the private defendants. *Id.* at 1080. Here, Wheelabrator Millbury's prices are regulated by its agreement with Franklin or any other town that contracts with it pursuant to M.G.L. c. 111, §§ 31A and 31B. Here, therefore, unlike in *Tri–State Rubbish,* adequate state supervision is not a concern.[6]

### B.

M.G.L. c. 93A, § 11 provides that the determination of what constitutes unfair methods of competition shall be guided by the Massachusetts Antitrust Act. A provision of that Act, M.G.L. c. 93, § 7 provides that activities which are not actionable under federal antitrust law (except for the fact that they do not involve interstate commerce) are immune from suit under state antitrust law. These provisions together mandate dismissal of Bonollo's proposed M.G.L. c. 93A claims.

\* \* \*

Bonollo's motion for summary judgment declaring the by-law unconstitutional is granted. Its motion for injunctive relief is denied as moot and its motion to amend the complaint as to the Corporate Defendants is denied.

The town of Franklin's motion to dismiss the complaint as to it as moot is granted to the extent of Bonollo's request for injunctive relief and is otherwise denied. The motion of the individual Town Defendants to dismiss the complaint as to each of them on the grounds of qualified immunity is granted.

The motion of the Corporate Defendants to dismiss the complaint as to each of them is granted.

It is so ordered.

---

6. On remand, the district court in Maine recently granted summary judgment to the defendants, dismissing the predatory pricing claim that was restored by the Court of Appeals. *See Tri–State Rubbish, Inc. v. Waste Management, Inc.,* 875 F.Supp. 8 (D.Maine 1994).